No. 24,440

*In re* DISBARMENT OF .H. F. GORSUCH.

SYLLABUS BY THE COURT.

1. DISBARMENT OF ATTORNEY—*Employing Others to Solicit Business for Him.* An attorney at law will be disbarred in this state for employing others to solicit business for him.

2. SAME—*Inducing Client to Give False Testimony.* An attorney at law will be disbarred for inducing his client to give false testimony in order to obtain a judgment for damages for personal injury.

3. SAME—*Jurisdiction of Supreme Court.* The supreme court of this state has jurisdiction to disbar an attorney at law for improper conduct.

Original proceeding in disbarment. Opinion filed April 7, 1923. Accusation sustained.

*Richard J. Hopkins,* attorney-general, and *James A. Troutman,* of Topeka, for the accusers.

*Joseph Taggart, Arthur J. Stanley, H. S. Roberts, C. W. Gorsuch,* all of Kansas City, for the accused; *H. F. Gorsuch,* of Kansas City, *pro se.*

The opinion of the court was delivered by

MARSHALL, J.: This is an original proceeding to disbar H. F. Gorsuch, an attorney at law in Wyandotte county.

*In re* Gorsuch.

1. One of the charges against the accused is that he "employed certain solicitors and agents commonly known as 'snitches' to secure business for him."

Honorable R. M. Hamer, of Emporia, the commissioner appointed by the court to take the evidence and make findings of fact and conclusions of law, finds:

"That in his work in soliciting and securing causes of action and claims he violates all of the ethical standards of lawyers, and is guilty of what is commonly known as 'snitching' cases."

The evidence to prove that charge and to support this finding may be summarized as follows: That the accused has been engaged in the practice of law in the county of Wyandotte; that John Notz, a frequenter of the office of the accused, was employed by him to solicit business; that John Notz, during the period of eighteen months, secured for the accused in this manner ninety-seven cases; and that in fifty-three different instances John Notz signed the cost bond in cases commenced by the accused. It appears from the evidence that John Notz was of unsavory reputation and was a man unworthy of belief. The accused testified that at the time the cost bonds were signed he did not know the reputation of John Notz but that as soon as that reputation was learned, the accused "fired" John Notz. John Notz testified that he was employed by the accused to secure cases for the latter. The evidence of the accused concerning his discharge of John Notz appears in the abstract as follows:

"Q. Your connection with Notz did not cease until you had trouble over the amount that he claimed in the Finn case, did it? A. Yes; it did.

"Q. Before that? A. Yes, I had fired him before that.

"Q. Fired him? A. Fired him out of the office and told him not to come around any more. He was hanging around the office.

"Q. You had no connection with him after that? A. I don't think so. Not after I was informed as to his general character and reputation."

The accused also testified that John Notz had driven an old car for the accused and procured witnesses for the accused in the trial of cases.

That testimony shows that John Notz was in the employ of the accused. A statement by the latter that he "fired" Notz out of the office and told him not to come around any more is not in harmony with the relations which the accused admits existed between him and John Notz. It was not necessary to "fire" John Notz to exclude

him from the office of the accused. The testimony of the latter corroborates the testimony of John Notz that he was employed by the accused to secure cases for him. There was other evidence which tended to show that the accused was getting business in the manner described. Reputable lawyers testified that he had the reputation of being a "snitch" lawyer.

The charge of "snitching" contained in the accusation is established by the evidence.

In *Judy & Gilbert v. Railway Co.*, 111 Kan. 46, 49, 205 Pac. 1116, this court said:

"Paragraph 28 of the code of professional ethics, as adopted by the American Bar Association and by the Bar Association of the State of Kansas, reads as follows:

" 'It is unprofessional for a lawyer to volunteer advice to bring a lawsuit except in rare cases where ties of blood, relationship or trust make it his duty to do so. Stirring up strife and litigation is not only unprofessional, but it is indictable at common law. It is disreputable to hunt up defects in title or other causes of action and inform thereof in order to be employed to bring suit, or to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office, or to remunerate policemen, court or prison officials, physicians, hospital attachés or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services. A duty to the public and to the profession devolves upon every member of the bar, having knowledge of such practice upon the part of any practitioner, immediately to inform thereof, to the end that the offender may be disbarred.'

"This rule is not statutory, but, in the matter of procuring business, it expresses the reasonable ideals of the able lawyers of the state and of the nation. This court has so far approved the rule that it has been regularly and continuously published in the monthly docket since October, 1920."

In 6 C. J. 598, this language is found:

"The following acts have been held to constitute misconduct sufficient to authorize the suspension or disbarment of an attorney . . . soliciting business in an unprofessional manner, as by employing paid agents to solicit retainers."

The practice of which the accused is guilty, that of employing others to secure business for him, tends to interfere with the work of the courts and with the administration of justice. It tends to promote unjust litigation on pretended claims for damages that do not exist. Public-service corporations and large business concerns

*In re* Gorsuch.

are the principal objects of prey for this kind of lawyers. The public, the patrons of these corporations and business concerns, must in the end pay these unjust claims and the expense of resisting them. Such practice should be condemned by the courts whenever opportunity presents itself.

2. Another charge against the accused is—

"That in the county of Wyandotte and state of Kansas, and on sundry days during the years 1921 and 1922, the said accused willfully violated his oath and the duty imposed upon him as an attorney at law, and committed acts unbecoming an attorney at law, in connection with an action then pending in the district court in said county and state, entitled: *Mike Finn v. The Missouri Pacific Railroad Company, a corporation,* No. 15,544, the same being an action brought by the plaintiff to recover damages from the defendant for injuries alleged to have been inflicted upon the plaintiff while riding upon one of defendant's trains, in this, to wit:

"(1) That prior to the trial of said action the plaintiff, Mike Finn, told said Gorsuch how the accident occurred; that Gorsuch stated to Finn that even if he proved the facts as stated by him, he could not recover, and told the plaintiff to what he should testify, and said if he would so ,testify he could recover damages; thereafter the plaintiff changed his statement of the facts to conform to the suggestion of Gorsuch, and so testified upon the trial of the action."

On this subject, the commissioner found:

"That in his work he secured one particular case, which in this report will be referred to as the 'Finn' case, and which case was entirely a frame-up and without merit. That after the accused secured the services of one Charles A. Blair, a member of the Wyandotte county bar, to try this case, and the accused and Mr. Blair had investigated this case for the purpose of trying it, Mr. Blair became so convinced that the case was without merit that he withdrew from the trial of this case and the accused persisted in the trial thereof and secured the services of another member of the Wyandotte county bar to try the case. That upon the trial of this cause in the district court of Wyandotte county, Kansas, a verdict was obtained in favor of the plaintiff for $14,500; and that thereafter such proceedings were had in that cause as to result in the granting of a new trial therein because of the corrupt practice used in framing up this case.

"The accused seek in this investigation to throw the bad odor of this Finn case upon one John Notz. The evidence further shows that this man Notz was such a frequenter of the accused's place of business that Notz signed cost bonds in some fifty-three cases secured by this accused during the year 1921.

"This commissioner concludes and finds, as a matter of fact, that it is impossible for the accused to have been innocent of a knowledge of the manner in which these cases were secured and handled, even though the work were done by the man Notz."

These findings are supported by the evidence of John Notz. His evidence shows that Mike Finn, who had been injured by a railroad

train, was in a hospital; that Notz visited Finn and secured a contract from him employing the accused to bring an action against the Missouri Pacific Railroad Company for the damages sustained; that Finn told Notz he was trying to catch a moving train, but was thrown under the train and his foot was cut off; that Notz reported those facts to the accused; and that the accused saw Finn and, in the presence of Notz, told Finn he must testify that he was on the train, that a brakeman came to him and had a conversation with him, and as a result Finn attempted to get off the train, that the brakeman hit Finn on the head and knocked him under the wheels, and that he was then injured and his foot was cut off. Mike Finn on the trial of his case against the railroad company testified as just outlined. The testimony appears to have been false.

It is difficult to conceive of conduct by a lawyer more reprehensible than that of which the accused is guilty. In a country where liberty prevails, law must rule. Life and property may be safe without liberty, but government is then arbitrary and autocratic. Where arbitrary power prevails, law, as we know it, is not necessary. Where law prevails, lawyers will be found. Their duty is to assist in the interpretation of the law and in the administration of justice. If they will not honestly, faithfully, patriotically perform that duty, government will fail to accomplish its purpose, and liberty will cease. The courts cannot, must not, pass unnoticed misconduct of lawyers admitted by the courts to assist in the interpretation of law and the administration of justice. What was said in *In re* Macy, 109 Kan. 1, 8, 196 Pac. 1095, is pertinent here.

The findings of the commissioner show that the accused is unfit to practice law.

3. It is argued that the supreme court does not have authority under the constitution to disbar an attorney at law. The argument is based on the principle that the jurisdiction of the supreme court, as fixed by the constitution, cannot be enlarged by legislative action. The statutes give to the supreme court power to admit and disbar attorneys at law. (Gen. Stat. 1915, § 478 and § 487.) Even if there were no statute giving this court power to disbar, that authority would exist. 6 C. J. 580 uses the following language:

"It is well settled that a court authorized to admit an attorney has inherent jurisdiction to suspend or disbar him for sufficient cause, and that such jurisdiction does not necessarily depend on any express constitutional provision or

statutory enactment. Not only has it this power, but whenever a proper case is made out it is its duty to exercise it. This inherent power of the courts cannot be defeated by the legislative or executive departments, although statutes may regulate its exercise. The proceeding is not for the purpose of punishment of the attorney, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them. The action of the court in the exercise of this power is judicial in its character, and the real question for determination in such proceedings is whether or not the attorney is a fit person to be longer allowed the privileges of being an attorney."

To support these principles, a large number of cases are cited, among which are several from Kansas. (*In re Peyton,* 12 Kan. 398, 404; *Farlin v. Sook,* 30 Kan. 401, 1 Pac. 123; *In re Smith,* 73 Kan. 743, 85 Pac. 584; *In re Wilson,* 79 Kan. 450, 100 Pac. 75:)

The judgment of the court is that H. F. Gorsuch be disbarred and that his name be stricken from the roll of attorneys of this state.

HOPKINS, J., not sitting.